UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

VULCAN MATERIALS COMPANY                                    PLAINTIFF

v.                                               No. 5:24-cv-184-BJB

DAVID W. REED & THE DAVID W. REED              DEFENDANTS
REVOCABLE TRUST

\* \* \* \* \*

### OPINION & ORDER GRANTING SUMMARY JUDGMENT

Near the confluence of the Cumberland, Tennessee, and Ohio Rivers, in Livingston County, rests one of the nation's most prolific gravel quarries. For decades, the Reed family owned and operated the quarry as a family business. But in 1990 they sold their stock to Alabama-based Vulcan Materials, the (self-styled) "nation's largest producer of construction aggregates." As part of the deal, Vulcan received an annual option to lease (for an additional sum) neighboring property from David Reed and his wife Vickie. Which Vulcan did, for almost 35 years. That arrangement broke down in 2023, however. Reed sued Vulcan in this Court, protracted litigation followed, the parties reached a settlement, and that settlement led to a new lease of the second property at $75,000 per year.

The new arrangement, however, proved even shakier than its predecessor. The lawyer for Reed and the Reed Revocable Trust (designated recipient of the lease payments) complained in November 2024 that Vulcan had missed its *first payment* that October. For reasons passing understanding, Vulcan still hadn't paid by December, when Reed and the Reed Trust purported to terminate the lease. Vulcan tried to wire the money a day later, but the Trust rejected the payment and locked Vulcan's agents out of the property. So Vulcan filed a breach-of-contract claim against Reed and the Trust, Second Amended Complaint (DN 29) ¶¶ 34–58, who counterclaimed for breach, Answer and Counterclaim (DN 5); Answer (DN 30).

During this second round of litigation, the parties have fought about a lot of things—but the relevant facts are not among their genuine disputes. So summary judgment on the contract-law questions is appropriate. *See* Motions for Summary Judgment (DNs 15 and 16).

1

## SUMMARY-JUDGMENT RECORD

*The Contract.* Vulcan Materials mined limestone on the disputed property from 1990 until 2023 under the terms of an option contract executed when Vulcan acquired the Reed Crushed Stone Company. In 2023, however, the Reeds refused to execute the lease option upon Vulcan's request, and Vulcan sued them in separate litigation before this Court. *See Vulcan Materials Company v. Reed*, No. 5:24-cv-13. The parties eventually reached a settlement, which led to a new ten-year renewable contract that authorized Vulcan to keep leasing the property. *See* Lease Agreement (DN 16-1), § 2.

That 2024 agreement contains three particularly relevant provisions:

1. Each year, "commencing on October 1," Vulcan must pay the Reed Trust "Annual Rent" of $75,000 "for the use of the Leased Premises." Lease Agreement § 3(a).

2. If Vulcan "at any time [is] in default in the payment of Annual Rent" and "fail[s] to remedy such default within ten (10) days after receipt of notice thereof from the Reed Trust," then "the Reed Trust, in addition to all other remedies given to the Reed Trust by law or in equity, may, by written notice to [Vulcan], terminate this Lease." § 22(a).

3. "Any notice or request under this Lease … shall be in writing and shall be deemed given when actually received or when deposited in the United States mail," addressed ("in the case of notice to the Company") to Vulcan's Alabama headquarters, "with a copy to" attorney Warren Hoffman. § 14.

Vulcan accepts as true, for the purposes of its summary-judgment motion only, that the first payment was due on October 1, 2024. Vulcan's Motion for Summary Judgment (DN 16) at 1 n.1. And it contends that an October 1 due date would be irrelevant to whether the Lease entitled the Defendants to terminate in the manner they attempted. Vulcan's Response to Defendants' MSJ (DN 22) at 5. So for both motions, the Court assumes, without deciding—based on Vulcan's representations and without relying on the emails mentioned below—that payment was indeed due October 1.[1]

---

[1] The Defendants cite emails from the contract negotiations purporting to show agreement that this language meant the annual payment was *due* on October 1. *See* Email from Vulcan to Reed, Ex. 1 (DN 15-2), at 2 ("Can we agree to October 1, 2024 for the date of the first Annual payment."); Email from Reed to Vulcan, Ex. 2 (DN 15-3), at 2 ("First payment

***The Email Exchange.***  Five weeks after that deadline, on November 8, Ron Haglof (Reed's attorney) emailed Hoffmann:

> I was speaking with David Reed yesterday, and he mentioned to me that he had not received the $75,000 lease payment that was due on October 1. I just wanted to mention that to you (and if you could acknowledge receipt of this email, I'd appreciate it).  Reed MSJ Ex. 3 (DN 15-4) at 3.

Hoffmann replied that same afternoon, thanking Haglof for "bring[ing] this to [his] attention" and promising to "get with Vulcan and revert."  *Id.*  Two weeks later, on November 22, Hoffmann emailed Haglof again and told him that "vendor set up for the David W. Reed Revocable Trust as the new payee was/is the hold-up but was/is in process and/or now is completed." *Id.* at 2.  Hoffmann asked Haglof to let him know if another week passed without payment.

Haglof didn't, even though no payment followed.  On December 4, however, Haglof wrote Hoffmann to terminate the lease.  Writing to Vulcan and Hoffmann on behalf of David Reed and the Reed Trust, Haglof attached a letter recounting his prior correspondence with Hoffmann regarding "Vulcan's failure to make the Required Payment."  DN 15-5 at 1.  And then Haglof's letter concluded that "as a result of Vulcan's default and failure to cure timely such default, on behalf of Reed we hereby notify you that the Lease is terminated pursuant to Section 22(a) thereof." *Id.* at 3. The next day, Vulcan attempted to wire the Reed Trust a $75,000 payment, but the Trust declined the transfer.  And consistent with the letter's warning that Vulcan would have "no further right of access to the property," the Trust later forbid Vulcan's contractors from accessing the property. *Id.* at 2; Vulcan MSJ at 6–7, 16.

---

on 10/01/2024 is agreed.").  But the Lease itself contains a provision indicating that it "constitutes the entire agreement between the parties … and supersedes all contemporaneous and prior agreements, understandings and representations with respect to the subject matter hereof."  Lease § 26.  And because both sides assume an October 1 payment deadline, resort to extrinsic evidence is unnecessary in any event.

## CROSS MOTIONS FOR SUMMARY JUDGMENT

Vulcan sued Reed and the Trust a week later—on December 11. It sought a declaratory judgment, an injunction, and damages (though not a temporary restraining order or preliminary injunction). Complaint (DN 1). The Defendants then answered and filed counterclaims against Vulcan, seeking similar relief, DN 5, and both sides moved for summary judgment. After briefing concluded, the Court granted Vulcan's unopposed motion to amend its complaint. DN 28. So Vulcan then filed an amended complaint, DN 29, and the Defendants an amended answer, DN 30, but neither party requested further summary-judgment briefing.[2]

In response to the dueling motions, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Insurance Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). The motions unearth two dispositive questions: whether the Reed Trust provided valid notice of its intent to terminate the lease, and whether Kentucky contract law permits that result (which Vulcan characterizes as excessively harsh) for a delayed payment.

From the Defendants' perspective, both answers are straightforward. Sophisticated parties—a Fortune 500 company on one side and successors to a decades-old family business on the other—reached a deal to settle a multimillion-dollar lawsuit in federal court. Based on that agreement, Vulcan got by bargain what it had demanded in court: the right to mine land adjacent to its quarry. All it had to do was make a $75,000 payment every year by October 1. Lease § 3(a). But if it didn't, it would be in default. § 22(a). The lease didn't define that term or supply any means by which Vulcan could contest its status. The lease did, however, clearly refer to default "in the payment of Annual Rent," leaving no doubt regarding the effect of nonpayment. And it gave Vulcan only 10 days "after receipt of notice" from the Trust in the case of such a default. *Id.* Otherwise the Trust could, "in addition to all other remedies," "terminate this Lease." *Id.* Again, all the bargained-for terms require to terminate is "written notice to the Company." *Id.* As evident from this spare text, Vulcan's procedural protections following a missed annual payment were hardly robust.

So when Vulcan didn't pay by October 1, it put its lease in jeopardy. And that risk increased dramatically after Vulcan heard from Reed's lawyer, on November 8, yet didn't promptly cure by paying the $75,000. Two weeks later, Vulcan's lawyer

---

[2] The Defendants' answer to the amended complaint incorporated by reference the counterclaim contained in their original answer. *See* Answer to Amended Complaint at 10.

responded that the payment was coming.  But it didn't arrive.  And rather than inquire of its whereabouts, the Trust terminated the lease on December 4, as the contractual language allowed.  No one disputes that payment was due on October 1, that Vulcan didn't make this payment, that Vulcan's lawyer received an email from Haglof on November 8, or that more than 10 days passed between Haglof's first email and his December 4 termination.  Nor, for that matter, does anyone contest that Vulcan was in default or received "written notice" of termination—or had any procedural right (other than curing by paying) to contest the Trust's default or termination determinations.  Finally, the lease plainly didn't require notice to arrive with any particular form or formality.  Given these undisputed facts and the limited obligations imposed by the lease, the Trust appears to have been well within its rights to terminate.

That choice may appear harsh, given Vulcan's quick responses to Haglof and its apparent difficulty setting up the Trust as the new payee under the new contract. But courts ordinarily must honor a lease's terms—including by enforcing default provisions.  *See AnyConnect v. Williamsburg Place*, 636 S.W.3d 556, 562–63 (Ky. Ct. App. 2021).  This is doubly true when a commercial contract resulted from counseled negotiations and agreement between sophisticated parties.  *See Cumberland Valley Contractors v. Bell County Coal Corp.*, 238 S.W.3d 644, 650 (Ky. 2007) (enforcing "arm's-length transaction between sophisticated parties with equal bargaining power").  When the terms are plain, nothing in Kentucky law calls on judges to reform the agreement or sand down any harsh edges.  *See Schwartz Amusement Co. v. IOOF, Howard Lodge, No. 15*, 128 S.W.2d 965, 968 (Ky. 1939) ("[W]hen the parties have made an express contract which will admit of but one interpretation, the court must give effect to it, since courts cannot make a new contract between the parties but must enforce the one the parties have made.").

Vulcan's counterarguments are limited—and unavailing.  Under the terms of the lease, it contends that notice was inadequate because it arrived from the wrong sender at the wrong destination with insufficient detail.  And under Kentucky law, Veritiv argues that termination is disfavored, especially with respect to mineral leases.  None of these arguments, however, overcomes the plain terms of the lease agreement.

**A. Four Corners of the Lease.**  As a matter of contractual interpretation, Vulcan challenges the sufficiency of the Defendants' notice—based on its sender and recipient, and content.

**1. *Sender.***  Did the notice of default come "from the Reed Trust"?  Lease § 22(a).  Vulcan says no: it came from Haglof, whose email "does not state that it was sent from or on behalf of the Reed Trust."  Vulcan MSJ at 9.  But the text of the lease

and email, the parties' course of dealing, and common sense all indicate that Reed Trust supplied the notice, through its lawyer, consistent with the agreement.

That lease lists Haglof as a lawyer acting on behalf of both David Reed and the Reed Trust. The notice provision identifies "Ron Haglof, Esq." as due a copy of any notice sent "to Reed or the Reed Trust." § 14. Consistent with that contractual specification, Haglof's November 8 email to Hoffmann identifies Haglof of Thompson Coburn LLP as writing after "speaking with David Reed yesterday" regarding the "Vulcan Materials / David Reed Trust property" and the August 30 "Lease Agreement."

Those textual links are more than enough; any reasonable and objective reader would understand that notice was sent on behalf of the Trust. Indeed, the whole point of the email was to convey a message on behalf of Reed regarding the "Trust property" regarding nonpayment of the lease rent. Reed MSJ Ex. 3 at 3. The Trust, after all, was the party entitled to the missing $75,000. As a corporate entity, moreover, it of course acted through its human agents and officers: Haglof and Reed. Would notice have sufficed, in Vulcan's eyes, if only Haglof had incanted the magic words "on behalf of Reed Trust"? Nothing in the lease or the parties' dealing necessitated such empty formalities.

Apparently Reed, the Trust, and Vulcan had been communicating through lawyers at least during the recent lease dispute. And likely for more than three decades, as Vulcan itself points out. *See* Vulcan Response to MSJ (DN 22) at 4 n.2, 12 n.5. This course of dealing, absent any resistance from a counterparty, sheds light on how parties understand their contracts and communications. *See Sidney Coal Co., Inc. v. Thrift Bit Service*, No. 2005-CA-628, 2006 WL 2578305, at \*1 (Ky. Ct. App. Sept. 8, 2006); *see also* RESTATEMENT (2D) OF CONTRACTS § 223 ("A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.").

In short, nothing in the record indicates any confusion over past practice or the import of Haglof's November 8 email—with respect to either the Reed Trust or its sole Trustee, David Reed. So Vulcan offers no reason why this notice should be read as sent on behalf of someone else.

**2. *Recipient.*** Does notice fail because only Hoffmann received the email? Again, the contractual text answers no. Section 14 contains two requirements: notice "shall be in writing" and "shall be deemed given when actually received or when deposited in the United States mail, certified with return receipt requested, addressed" to Vulcan Materials Company in Birmingham "with a copy to: Warren J. Hoffmann."

6

No one disputes that Hoffmann "actually received" it, or that he passed the message along to his client.  This is entirely consistent with the role of "an attorney" as "an agent for the client with broad power to act for and on the client's behalf." *Clark v. Burden*, 917 S.W.2d 574, 575 (Ky. 1996).  As discussed above, Hoffmann's pledge to consult with his client "and revert" along with his later attribution of the delayed payment to a vendor system plainly indicates that Vulcan—through its agent and attorney of record—received Haglof's notice.  That should end the matter.

But Vulcan complains of a technical nonconformity: the notice wasn't "sent to the business address listed in the Lease and directed *to the attention of Vulcan's General Counsel*."  Vulcan MSJ at 9 (emphasis in original).  Why would this matter?  Notice is effective "when actually received *or* when deposited in the United States mail."  Lease § 14.  Vulcan's assertion treats "or" as "and."  That's obviously wrong.  Kentucky courts have repeatedly held—when interpreting statutes and contracts alike—ordinarily the word "or" is disjunctive.  *See Megson Farms v. Kentucky Training Center*, No. 2023-CA-0215, 2024 WL 2869622, at *4 (Ky. Ct. App. June 7, 2024) (contract); *Biddle v. Public Service Commission of Kentucky*, 643 S.W.3d 83, 92 (Ky. Ct. App. 2021).  Nothing about the text or context suggests a different meaning here.  A "disjunctive condition," according to BLACK'S, is one "requiring the performance of one of several acts to be chosen by the performer."  Here, the Reed Trust chose actual notice.  And as discussed above, notice was effective *either* when actually received "or" when deposited in the mail to Vulcan.

**3. *Content.***  Did Haglof's November 8 email amount to "notice" under the lease's terms?  The instrument says little about either what puts Vulcan "in default in the payment of Annual Rent" *or* what constitutes "notice thereof."  Section 22(a) merely provides that Reed Trust may terminate if Vulcan "shall at any time be in default in the payment of Annual Rent" and "shall fail to remedy such a default within ten (10) days after receipt of notice thereof."  Lease § 22(a).  Vulcan contends that the November 8 email failed to provide sufficient "notice thereof" because it "appeared to be nothing more than an informal courtesy email between counsel" rather than a formal "notice of default."  Vulcan MSJ at 11.

But as the Reed summary-judgment response explains, this message, no matter how "polite" and familiar, supplied whatever limited formalities the lease required:

> Vulcan's characterization of the email confuses "informal" with polite. The email was from one attorney to another attorney concerning client matters on which both had worked.  The email expressly requested an acknowledgement of receipt. The email was acknowledged by Vulcan's counsel with the assurance that Vulcan would be consulted. The

individuals involved were the same individuals who drafted and finalized the lease two months earlier. Informal communications do not typically take such a form.

Reed Response to MSJ (DN 23) at 5.

It's not apparent what additional information Vulcan believes Haglof needed to convey in order to satisfy § 22's bare "notice" requirement. The lease doesn't require a warning about potential termination. And as noted above, Hoffmann's response demonstrated no confusion about what needed to happen next: He promised to "get with" his client to resolve the issue. Reed MSJ Ex. 3 at 3. Later, he followed up regarding the missing payment by acknowledging difficulties paying the Trust through Vulcan's vendor-payment system. *Id.* at 2. So between the email's message and Hoffmann's response, the record reveals no doubt whatever about whether the November 8 email "provided notice" under § 22(a) that Vulcan was in default for not paying its annual rent.

**B. Additional State-Law Arguments.** Separately, as a matter of state law, Vulcan asserts that termination requires more than what appears on the face of the lease. Provisions contemplating "forfeiture"—in this context, meaning termination of a lease—in the event of default are generally disfavored and thus "must be interpreted against the one claiming forfeiture." *See Hogg v. Forsythe*, 248 S.W. 1008, 1011 (Ky. 1923); *see also* RESTATEMENT (2d) OF CONTRACTS § 227(1) ("In resolving doubts as to whether an event is made a condition of an obligor's duty … an interpretation is preferred that will reduce the obligee's risk of forfeiture."). But Vulcan hasn't identified any ambiguity in the contractual language that ought to be construed against Reed.

Instead, Vulcan tries to invoke a special rule of Kentucky property law that imposes extra procedural requirements before courts, as a matter of equity, order the forfeiture of some oil-and-gas leases. It cites *Carrs Fork Corp v. Kodak Min. Co.*, 809 S.W.2d 699 (Ky. 1991), for the proposition that forfeiture will not "be allowed without the one claiming the right first giving notice that a forfeiture will be demanded unless the terms of the lease are followed." *Id.* at 702. It also cites an Indiana decision rejecting as inadequate notice in the form of a landlord's letter stating that rent was overdue and demanding immediate payment. *See* Vulcan's MSJ at 10 (citing *Whiteco. Industries v. Nickolick*, 571 N.E.2d 1337, 1340 (Ind. App. 1991)). That letter, like this one, was to Vulcan's eyes not a proper notice of default because it didn't mention default or termination. *Id.*

True, Haglof's November 8 email didn't mention termination either. And Kentucky law sometimes erects barriers to exit oil or gas leases not found in their contractual terms. *See Cameron v. Lebow*, 338 S.W.2d 399, 404–05 (Ky. 1960).

8

Before a court will order cancellation and forfeiture, the lessor must "giv[e] notice and deman[d] production." *Id.* at 405. ("Cancellation is not automatic and may be accomplished only through judicial action.").

But these restrictions are specific to particular leases involving particular extraction obligations—also known as a "duty to develop." *See* Keith Hall, *Implied Covenants and the Drafting of Oil and Gas Leases*, 7 LSU J. ENERGY L. & RESOURCES 401, 403–12 (2019) (discussing history of implied covenants in mineral contracts). Many oil and gas leases provide consideration to the lessor in the form of a percentage of the proceeds from whatever the lessee extracts. So if the lessee doesn't extract anything, the lessor doesn't get paid—and agency problems abound. To avoid such misaligned incentives and knowledge, courts (including in Kentucky) have inferred from these leases a duty to extract minerals. *Id.*; *Cameron*, 338 S.W.2d at 405. And if a lessee fails to extract sufficient minerals, a lessor can seek—as a matter of equity—a court order canceling the lease and restoring the lessor's mineral rights, even if the contract contains no express termination provision. *See W.T. Waggoner Estate v. Sigler Oil Co.*, 19 S.W.2d 27, 29 (Tex. 1929) ("The usual remedy for breach of the lessee's implied covenant for reasonable development of oil and gas is an action for damages, though, under extraordinary circumstances—where there can be no other adequate relief—a court of equity will entertain an action to cancel the lease in whole or in part."). But "[s]ince the duty to develop is based on an implied covenant, lessees are protected by the rule requiring a demand for compliance therewith, and a reasonable time therefor, which the courts of equity ordinarily require before decreeing forfeiture in other implied covenant cases." *Doss Oil Royalty Co. v. Texas Co.*, 137 P.2d 934, 938 (Okla. 1943). So, contrary to Vulcan's suggestion, this line of authority doesn't speak of a pre-termination notice requirement across the board—but only in service of an implied right to terminate.

Outside this specific context, moreover, Kentucky law is equally clear that no special notice and demand is required. If a lessee has abandoned a property, for example, notice would serve no function—and forfeiture may occur without it. *See B & B Oil Co. v. Lane*, 249 S.W.2d 705, 706 (Ky. 1952) ("If he has abandoned it, he knows that fact and is entitled to no notice; while if lessee is only remiss or dilatory in the manner in which he is developing or operating the property, he is entitled to notice that he must improve his operations."). And if the lease's provisions provide for termination in the event of a failure to pay rent, no resort to equity is required: courts will enforce the lease's provisions in the ordinary course. Without more, "the nonpayment of rent does not operate as a forfeiture of the lease; but there is no question that a provision in the contract for a forfeiture upon such default is valid and binding." *Estes v. Gatliff*, 163 S.W.2d 273, 276 (Ky. 1942).

Vulcan cannot invoke this limited equitable exception to prevent contractual termination of the lease here.  For one thing, this lease does not involve oil or gas, where the implied-termination caselaw most clearly applies.[3]  For another, this (often implied) covenant to extract—on pain of equitable termination—*expands* rather than contracts the termination rights of lessors.  More important, Vulcan's lease expressly disclaims any "implied duty to quarry," Lease § 23, so the agency concerns animating the cited Kentucky caselaw don't apply.   And most important of all, the lease here contains an express agreement about termination.  *See Leeper Oil Co. v. Rowland*, 39 S.W.2d 486, 488–89 (Ky. 1931) ("The [notice-and-demand] doctrine was evolved by the courts, when no forfeiture or cancellation was provided for in the lease, to effectuate the intention of the parties that would do justice to the lessor as well as the lessee.").  That agreed term is "sufficient to dispense with the necessity of demand or notice before bringing forcible detainer." *Eichert v. Bargas*, 51 Ky. 462, 465 (1851) ("A stipulation in a lease that the bare non-payment of rent for ten days after due, shall give a right to sue without notice…."); *see also AnyConnect*, 636 S.W.3d at 562–63 (similar).    Outside the narrow oil-and-gas exception, therefore, and in the presence of an express termination provision, the general rule holds: a lease's terms define what (if any) notice is required before termination.  *See, e.g.*, *Pettitte v. Smith*, 87 S.W.2d 945, 945–46 (Ky. 1935); *Stoll Oil Refining Company v. Pierce*, 337 S.W.2d 263, 264–65 (Ky. 1960).  And as discussed above, the Reed Trust complied with those terms.

That leaves only Vulcan's argument that principles of equity prohibit termination of the lease, a result its briefing calls "harsh."  Vulcan MSJ at 3.  But equity ordinarily does not relieve parties from contractual provisions—however they might be characterized in hindsight—to which they've agreed.  Kentucky's highest court recognized long ago the narrow role equity may play in altering the effect of a contract.  "While a court of equity will relieve against a forfeiture on account of the nonpayment of rent where circumstances are shown justifying" equitable relief, "the

---

[3] Whether gravel counts a mineral is a surprisingly difficult question—albeit academic and immaterial here. *See, e.g.*, Christopher Hayes, *Now Is It a Mineral? The Supreme Court Takes Another Look at Sand and Gravel*, 41 ROCKY MOUNTAIN MIN. L. FOUND. J. 297 (2004) (comparing the Supreme Court's approach to determining whether sand and gravel are "minerals" in two cases under two statutory schemes).  Kentucky cases likewise may be read to cut in opposite directions.  *Compare Little v. Carter*, 408 S.W.2d 207, 209 (Ky. 1966) (limestone is not a mineral), *with Hughett v. Caldwell County*, 230 S.W.2d 92, 96 (Ky. 1950) (applying oil and gas trespass cases to fluorspar).  The Kentucky Supreme Court's most recent discussion—in the context of mineral trespass—concluded that "[g]eology is not determinative" and declined to "craft an arbitrary exception" to existing mineral-trespass doctrine.  *Harrod Concrete and Stone Co. v. Crutcher*, 458 S.W.3d 290, 297 (Ky. 2015).

court cannot make for the parties a different contract than they have made for themselves." *Wender Blue Gem Coal Co. v. Louisville Prop. Co.*, 125 S.W. 732, 734–35 (Ky. 1910). *See also* WILLISTON ON CONTRACTS § 31:5 (4th ed. 2025) ("[W]hen interpreting a contract, a court may not insert, delete, or ignore contractual provisions."). So this equitable argument fares no better than Vulcan's doctrinal contentions: Vulcan and the Reed Trust agreed to a lease permitting termination upon default and ten days' notice, Vulcan defaulted by not paying rent on time, and the Reed Trust terminated the lease after providing ten days' notice. Whether equitable arguments may ultimately affect remedial rights, of course, is a separate question.

**\* \* \***

The Court therefore grants Reed's motion for summary judgment (DN 15), and denies Vulcan's motion (DN 16). This opinion does not address the Defendants' counterclaim, nor any remedies to which they might be entitled. The parties should confer in good faith and file joint or separate status reports addressing appropriate next steps in this litigation within 45 days.

11